1

2

3

4                          UNITED STATES DISTRICT COURT

5                              DISTRICT OF NEVADA

6                                      * * *
                                         )
7   OSCAR ALMARAZ, et al.,               )
                                         )
8              Plaintiffs,               )
                                         )              2:11-CV-01983-PMP-PAL
9   v.                                   )
                                         )
10  VISION DRYWALL & PAINT, LLC, et      )              ORDER
    al.,                                 )
11                                       )
               Defendants.               )
12  _____ )

13          Presently before the Court is Plaintiffs' Motion for Summary Judgment as to

14  Vision Drywall & Paint, LLC and Individual Defendants (Doc. #75),[1] filed on March 21,

15  2013.  Defendants Vision Drywall & Paint, LLC, Javier Rodriguez, and Manuel Rodriguez

16  filed a Response (Doc. #86) on April 29, 2013.  Plaintiffs filed a Reply (Doc. #91) on May

17  16, 2013.

18  **I. BACKGROUND**

19          Named Plaintiffs Oscar Almaraz ("Almaraz"), Ismael Perez Cruz ("Perez Cruz"),

20  and Efren Gonzalez are drywall laborers who brought this action on behalf of themselves

21  and other similarly situated current and former employees of Defendant Vision Drywall &

22  _____

23          [1]  Plaintiffs' counsel failed to redact Plaintiffs' home addresses and social security numbers
    from Exhibits A and U to this Motion, in contravention of United States District Court, District of
24  Nevada Special Order No. 108.  Special Order No. 108 provides that "parties shall refrain from
    including, or shall partially redact" social security numbers, names of minor children, dates of birth,
25  financial account numbers, and home addresses.  To protect Plaintiffs' personal identification
    information, the Clerk of Court shall seal Plaintiffs' Motion for Summary Judgment as to Vision
26  Drywall & Paint, LLC and Individual Defendants (Doc. #75) in its entirety.  Plaintiffs' counsel shall
    re-file the entire Motion, including all exhibits, with appropriate redactions to all exhibits per Special
    Order No. 108, for the public record within seven (7) days from the date of this Order.

Paint, LLC ("Vision") for alleged Fair Labor Standards Act ("FLSA") and Nevada state law wage and hour violations.  Twenty-four other employees filed opt-in consents with the Court.  (Notice of Filing Opt-In Consent Forms (Doc. ##9, 15, 37, 38, 39, & 63).)  One of the named Plaintiffs, Efren Gonzalez, and four of the opt-in Plaintiffs subsequently were dismissed from the case, resulting in a total class of twenty-two Plaintiffs.  (Order (Doc. #70); Order (Doc. #73).)

Individual Defendants Javier Bernal Rodriguez and Manuel Rodolfo Rodriguez are brothers who are Vision's managing members, and each own a fifty percent interest in the company.  (Compl. (Doc.# 1) at ¶ 18; Answer (Doc. #26) at ¶ 18; Pls.' Mot. for Summ. J. as to Vision Drywall & Paint, LLC & Individual Defs. (Doc. #75) ["Pls.' MSJ as to Vision"], Ex. N at 16, Ex. T at 20.)  Plaintiffs allege Javier and Manuel Rodriguez, along with Vision, were Plaintiffs' joint employers.  (Compl. at ¶ 41.)  In their capacity as co-owners of Vision, Javier and Manuel Rodriguez shared managerial duties such as obtaining new business, visiting project sites, and communicating with general contractors regarding bids, project schedules, or issues on the project sites.  (Pls.' MSJ as to Vision, Ex. N at 17, 28-29, Ex. T at 21, 64-66, 87-88, 91-92, Ex. V at 25.)  According to Manuel Rodriguez, he and his brother "run the company, both of us."  (Pls.' MSJ as to Vision, Ex. T at 91-92.)  Manuel Rodriguez hired Vision supervisor Heber Chavez.  (Id. at 28.)  He also hired Jesus Munoz and Sabino Placido as regular employees, and they eventually were promoted.  (Id. at 28-29.)  Vision's controller, Mimi Gaumond, was responsible for payroll.  (Pls.' MSJ as to Vision, Ex. R at 76, Ex. T at 94-96.)

Almaraz and Perez Cruz, however, testified they were hired by Vision supervisors or crew leaders.  (Defs.' Opp'n to Pls.' Mot. for Summ. J. (Doc. #86), Ex. B at 45-46, Ex. F at 86.)  Some of the opt-in Plaintiffs also testified that they were hired by Vision supervisors or crew leaders and that they filled out applications at Vision's office.  (Id., Ex. K at 39-40, Ex. W at 47-48, Ex. Y at 48-49.)  Almaraz, Perez Cruz, and various

1  other Plaintiffs testified that they did not know Javier and Manuel Rodriguez.  (Id., Ex. B at
2  109-110, Ex. E at 65, Ex. F at 153, Ex. J at 69, Ex. K at 72, Ex. W at 76, Ex. Y at 84.)

3  Defendants Las Vegas Land Contracting LLC d/b/a Dunhill Homes; Burke
4  Construction Group, Inc.; Richmond American Homes of Nevada, Inc.; Harmony Homes,
5  Inc.; Desert Wind Homes of Nevada II, Inc. d/b/a Russell Rogers Development; KB Home
6  Las Vegas, Inc.; and KB Home Nevada, Inc. (collectively, the "General Contractor
7  Defendants") are various general contractors who subcontracted with Vision for drywall
8  installation and finishing services.  (Compl. at ¶¶ 19-25; Answer at ¶¶ 19-25; Pls.' Mot. for
9  Summ. J. as to General Contractor Defs. (Doc. #77) ["Pls.' MSJ as to General Contractor
10 Defs."], Exs. A, G, Q, V, Z, CC.)  Plaintiffs allege that they worked on the General
11 Contractor Defendants' projects and that the General Contractor Defendants, along with
12 Vision, were Plaintiffs' joint employers.  (Compl. at ¶¶ 43, 45, 47, 49, 51, 53, 55.)

13 According to named Plaintiffs Almaraz and Perez Cruz, while employed by
14 Vision to work on the General Contractor Defendants' projects, they were not paid the
15 minimum wage, were not paid overtime, and were promised a certain rate of pay but were
16 paid another.  (General Contractor Defs.' Mot. Summ. J. (Doc. #76) ["Defs.' MSJ"], Ex. T,
17 Ex. U.)  In his deposition, Almaraz testified he regularly worked Monday to Saturday for
18 approximately eleven hours per day, and Perez Cruz testified he regularly worked twelve
19 hours per day.  (Resp. to Defs.' Mot. for Summ. J. (Doc. #85) ["Resp. to Defs.' MSJ"], Ex.
20 I at 124, Ex. J at 85.)  Opt-in Plaintiffs Christian Lomeli, Erik Demha Roque, German
21 Bravo Martinez,[2] Jaime Barraza, Joel Solis, Jose Garcia Cruz, Porfirio Pamplona Santos,

22

23     [2]  German Bravo Martinez testified he worked from 5:00 a.m. to 9:00 or 10:00 p.m. with
twenty to thirty minute lunch and dinner breaks, seven days per week.  (Defs.' Opp'n to Pls.' Mot. for
24 Summ. J. (Doc. #86), Ex. U at 35-36, 42-43.)  This testimony indicates he worked over 100 hours per
week.  Elsewhere in his deposition, he testified he worked "[a]round 80" hours per week.  (Id. at 40.)
25 He further testified he gave Erik Demha Roque rides to and from work, but Roque testified Roque
usually worked fifty to sixty hours per week.  (Id. at 36-37, Ex. E at 38.)  Elsewhere in his deposition,
26 Roque testified that when he was working on the Tuscany project, he worked from 5:00 a.m. or 6:00

1   Raul de la Cruz Rodriguez, and Jose Palacio also testified they regularly worked over forty

2   hours per week.  (Pls.' MSJ as to Vision, Ex. D at 75, Ex. E at 38, Ex. F at 35, 40, Ex. G at

3   47, 70, Ex. I at 61-62, Ex. J at 79, 87-88, Ex. K at 90, Ex. L at 32-33, Ex. M at 82.)

4           In his deposition, however, Almaraz was unable to estimate the number of hours

5   of overtime compensation he is owed by Vision.  (Defs.' Opp'n to Pls.' Mot. for Summ. J.

6   (Doc. #86) ["Defs.' Opp'n to Pls.' MSJ"], Ex. F at 176-78.)  Perez Cruz testified that

7   although there were many weeks in which he worked more than forty hours, he could not

8   identify the particular weeks he worked overtime.  (Defs.' MSJ, Ex. C at 88.)  Almaraz and

9   Perez Cruz also stated that there were periods when work was slow, including the holidays,

10  and periods when they did not work more than forty hours per week.  (Defs.' MSJ, Ex. B at

11  116, 124, Ex. C at 70-71, 86-88, 99-101; Defs.' Opp'n to Pls.' MSJ, Ex. B at 79.)  Perez

12  Cruz further testified that his crew completed more houses than other crews because they

13  worked faster.  (Defs.' Opp'n to Pls.' MSJ, Ex. B at 67-68.)  Opt-in Plaintiffs Jaime

14  Barraza, Raul de la Cruz Rodriguez, and Jose Garcia Cruz also were unable to estimate the

15  overtime compensation they are owed by Vision.  (Pls.' MSJ as to Vision, Ex. G at 76, Ex.

16  L at 63; Defs.' Opp'n to Pls.' MSJ, Ex. D at 92.)  Opt-in Plaintiff Christian Lomeli testified

17  that although he could not approximate the total overtime hours for which he had not been

18  paid by Vision, he "almost always" was "short a payment for 10 or 20 hours."  (Pls.' MSJ

19  as to Vision, Ex. D at 86.)

20          Additionally, Almaraz and Perez Cruz stated there were various irregularities

21  with respect to Vision's payroll practices.  (Defs.' MSJ, Ex. T, Ex. U.)  For instance,

22  Almaraz stated he never received paychecks; instead, his crew leader Celestino Monterrosas

23  Silva would cash crew members' paychecks, keep a portion of the checks for income tax,

24

25  a.m. until 7:00 p.m. or 8:00 p.m., or sometimes as late as 10:00 p.m.  (Pls.' Reply to Defs.' Opp'n to
    Pls.' Mot. for Summ. J. (Doc. #91), Ex. E at 48.)  However, the excerpts of Roque's deposition
26  provided to the Court do not state how many days per week he worked at the Tuscany project.  (Id.)

and then pay them "whatever he thinks we deserve."  (Defs.' MSJ, Ex. T; see also Pls.' MSJ as to Vision, Ex. B at 94.)  Regarding a project called Perry Plaza, Almaraz stated he was promised $48.65 per hour, but that he was paid only $1,000 for a five-day work week because a percentage of his pay had to be given to various Vision supervisors and crew leaders.  (Defs.' MSJ, Ex. T; Pls.' MSJ as to Vision, Ex. B at 157-58.)

Perez Cruz stated that he and his crew members received paychecks made out to other people, cashed the paychecks at a liquor store, pooled the money, and then divided it in equal parts among the crew members.  (Defs.' MSJ, Ex. U.)  Some other Vision crew members also would cash their own checks, pool the money, and then divide it equally amongst themselves.  (Pls.' MSJ as to Vision, Ex. D at 69, Ex. H at 48.)  Some Vision employees were paid in cash, and some in a combination of checks and cash.  (Pls.' MSJ as to Vision, Ex. B at 94, Ex. G at 52, Ex. I at 50-52, Ex. J at 53, Ex. L at 29, 31, Ex. M at 48.)  Various Plaintiffs testified they did not complain to their supervisors or to Vision's offices regarding their payment issues.  (Defs.' Opp'n to Pls.' MSJ, Ex. B at 11, 58, 153, Ex. J at 52-53, Ex. K at 58, Ex. L at 56, 88.)

Vision paid Plaintiffs a piece rate rather than an hourly rate.[3]  (Pls.' MSJ as to Vision, Ex. N at 39-40, Ex. Q at 43, Ex. S, Ex. T at 37; Defs.' Opp'n to Pls.' MSJ, Ex. A at ¶ 5.)  According to Defendant Javier Rodriguez, "[b]y paying crew members piece-rate, they tend to work more steadily and do not have to be supervised all of the time."  (Defs.' Opp'n to Pls.' MSJ, Ex. A at ¶ 5.)  The piece rates were set by Mimi Gaumond, Javier or Manuel Rodriguez, or Vision's "estimator."  (Pls.' MSJ as to Vision, Ex. N at 26, 29; Defs.' Opp'n to Pls.' MSJ, Ex. Z at 30-31.)  Heber Chavez testified that each house has a price based on the piece rate system, and that the crew members decide how the money is going to be divided amongst themselves based on the hours each crew member worked.  (Pls.'

_____

[3]  One opt-in Plaintiff testified he was paid by the hour, not by the piece.  (Pls.' MSJ as to Vision, Ex. E at 39.)

MSJ as to Vision, Ex. Q at 51-53.)

Mimi Gaumond testified during her November 13, 2012, deposition that Vision formerly did not track employees' hours, but stated "we made that change this year.  We do track all the hours."  (Pls.' MSJ as to Vision, Ex. R at 62-63.)  Regarding Vision's former procedure for calculating employees' pay when hours were not tracked, Mimi Gaumond testified:

> We knew it took about x amount of time for them to do all this work here for all these guys.  And then back then, it was an average of, you know, they would make about $20 an hour.  We just took an average of what they would actually make an hour. So we just based the hours based on that, on their rate.

(Id. at 63.)  Various examples of Vision time sheets from 2011 do not include a column for recording the number of hours employees worked.  (Pls.' MSJ as to Vision, Ex. O; Pls.' MSJ as to General Contractor Defs., Ex. J at VDP000170, VDP000095, VDP000046, VDP002826, VDP000048.)  However, another Vision time sheet dated October 24, 2011, includes a column for recording hours.  (Pls.' MSJ as to General Contractor Defs., Ex. J at VDP000102.)

Regarding the current procedure for tracking hours,[4] Defendant Manuel Rodriguez stated Vision's policy is that individual employees "have to record their own times, when they start and finish."  (Pls.' MSJ as to Vision, Ex. T at 38.)  Defendant Javier Rodriguez and Mimi Gaumond, however, testified that Vision supervisors are supposed to write down how many hours each employee works, and that if the supervisor is not on the job site, the crew leaders assist supervisors in tracking hours.  (Pls.' MSJ as to Vision, Ex. N at 32-33, Ex. R at 48-49; Defs.' Opp'n to Pls.' MSJ, Ex. A at ¶ 4.)  Each week, employees verify that the number of hours reported by their supervisor is correct by signing a verification sheet showing their total number of hours worked.  (Defs.' Opp'n to Pls.'

---

[4] Based on the evidence in the record, it is unclear when this procedure for tracking hours was implemented and whether this procedure existed at the time of the events in question.

MSJ, Ex. A at ¶ 4, Ex. G at ¶ 9.)  Several Plaintiffs also testified that it was a Vision supervisor who recorded either their hours or the number of houses they had completed. (Pls.' MSJ as to Vision, Ex. C at 62, Ex. D at 68, Ex. H at 42-43.)  Other Plaintiffs testified that they did not track their own hours, that no one else kept track of their hours, or that they did not know whether anyone kept track of their hours.  (Pls.' MSJ as to Vision, Ex. F at 36, Ex. G at 76, Ex. J at 61, Ex. K at 85, Ex. L at 34.)

Vision required employees to sign an "Employee Overtime Obligation" form stating Vision "discourages overtime work" and in which employees agreed "not to work overtime without first getting specific authorization from my supervisor or other management personnel."  (Pls.' MSJ as to Vision, Ex. P; Defs.' Opp'n to Pls.' MSJ, Ex. A at ¶ 3, Ex. 1.)  Several Plaintiffs testified they did not read the policy regarding overtime, did not remember signing the policy, or were not aware of the policy.  (Pls.' MSJ as to Vision, Ex. B at 92-93, Ex. C at 59, Ex. F at 48, Ex. G at 52, Ex. I at 49-50, Ex. J at 93.)  In contrast, Defendants argue several Plaintiffs acknowledged they were aware of or had signed Vision's policy regarding overtime.  (Defs.' Opp'n to Pls.' MSJ at 5-6.)  However, with the exception of two Plaintiffs, it is somewhat unclear from the deposition testimony Defendants submit in support of this argument exactly which document Plaintiffs are acknowledging having signed.  (See Defs.' Opp'n to Pls.' MSJ, Ex. B at 61, Ex. C at 49-50, Ex. E at 41.)  As for two Plaintiffs who are testifying about the overtime policy, one states he had not read the policy and the other states he did not remember seeing the policy, and they both testify it was not their signature on the document.  (Defs.' Opp'n to Pls.' MSJ, Ex. D at 93-95, Ex. F at 93.)

Vision's supervisors were instructed not to allow employees to work more than forty hours per week.  (Pls.' MSJ as to Vision, Ex. N at 33; Defs.' Opp'n to Pls.' MSJ, Ex. A at ¶ 4, Ex. G at ¶¶ 4, 6, Ex. H at ¶ 4, Ex. I at ¶¶ 4-6.)  Supervisor Sabino Placido states in his declaration that "I do not remember crew members working any overtime hours."

(Defs.' Opp'n to Pls.' MSJ, Ex. H at ¶ 4.)  Similarly, supervisor Heber Chavez averred that "I do not remember crew members ever working more than eight (8) hours in a day or more than forty (40) hours in a week" and that "I have never allowed crew members [to] work more than eight (8) hours a day or more than forty (40) hours a week."  (Defs.' Opp'n to Pls.' MSJ, Ex. I at ¶¶ 4, 6.)  Supervisor Jesus Munoz stated in his declaration that "only very rarely have crew members worked more than eight (8) hours a day or more than forty (40) hours a week."  (Defs.' Opp'n to Pls.' MSJ, Ex. G at ¶ 10.)

Regarding employees' knowledge of the overtime policy, supervisor Heber Chavez testified employees "know that they have eight hours from the time that they start or if they took a break, they know when is eight hours, or I call them for them to stop working."  (Pls.' MSJ as to Vision, Ex. Q at 43.)  He further testified that although he was not always present at the jobsite when employees left at the end of the day, he would call them to find out what time they left "to make sure they [didn't] work more than eight hours."  (Id. at 41.)  Defendant Manuel Rodriguez also testified that Vision supervisors are not present on jobsites all day long.  (Pls.' MSJ as to Vision, Ex. T at 69.)

In the event employees worked overtime, Defendant Javier Rodriguez averred the employees are paid "piece and one-half."  (Defs.' Opp'n to Pls.' MSJ, Ex. A at ¶ 5.)  Vision's Piecework Agreement similarly states that employees will be paid at "piece and one half" for any overtime.  (Pls.' MSJ as to Vision, Ex. S.)  Javier and Manuel Rodriguez testified that Vision employees occasionally worked on Saturdays and sometimes worked more than eight hours per day, but that they never worked on Sundays.  (Pls.' MSJ as to Vision, Ex. N at 28, 34, Ex. T at 37.)  Mimi Gaumond testified that employees would work on Saturdays when they did not work earlier in the week and "because they may have started a house in the middle of the week or Thursday where they need to get it completed."  (Pls.' MSJ as to Vision, Ex. R at 45-46.)  Supervisors Jesus Munoz and Sabino Placido averred that they do not allow crew members to work Saturdays unless they did not work at

least one day earlier in the week and that employees do not work on Sundays.  (Defs.'
Opp'n to Pls.' MSJ, Ex. G at ¶ 6, Ex. H at ¶ 5.)

Defendant Javier Rodriguez testified that Vision had not paid overtime pursuant
to its overtime policy in the five years before his 2012 deposition because "we barely stay
busy right now.  There's hardly any work out there."  (Pls.' MSJ as to Vision, Ex. N at 55;
Defs.' Opp'n to Pls.' MSJ, Ex. A at ¶ 6.)  Javier Rodriguez further averred that because
many of the jobsites are in residential areas and the general contractors limit the hours in
which construction can take place, "it can be very difficult for crew members to work
overtime even if necessary."  (Defs.' Opp'n to Pls.' MSJ, Ex. A at ¶ 7.)  Supervisor Heber
Chavez similarly averred that "[o]ver the last six years, drywall work has been really slow.
Crew members would only work two or three days a week, maybe four at the most.  Many
crew members left Vision and went to work for other drywall companies to try and find
more hours during this time."  (Defs.' Opp'n to Pls.' MSJ, Ex. I at ¶ 5.)  Supervisors Jesus
Munoz and Sabino Placido similarly stated that work had been slow during the recession.
(Defs.' Opp'n to Pls.' MSJ, Ex. G at ¶¶ 7-8, Ex. H at ¶ 6.)  Vision submits declarations
from seven Vision employees who are not parties to this case stating that Vision employees
typically do not work more than forty hours per week.  (Defs.' Opp'n to Pls.' MSJ, Exs. M-
S.)  In its responses to Plaintiffs' Interrogatories, however, Vision states that it paid
Almaraz "$102 in overtime wages on June 17, 2011 for 3.4 hours of overtime work paid
based on a regular rate of $20 an hour" and that on December 30, 2011, it paid Jaime
Barraza "$160.20 for 5.3 hours of overtime work . . . based on a regular rate of $20 an
hour."  (Defs.' Opp'n to Pls.' MSJ, Ex. V at 4.)

Plaintiffs brought suit against Defendants, alleging collective action claims under
the FLSA, 29 U.S.C. §§ 206 and 207, for failure to pay minimum wages and overtime
wages (counts one and two).  (Compl. at 11-13.)  Plaintiffs also alleged Nevada state law
class action claims to recover wages, overtime wages, and waiting time penalties, and for

breach of contract (counts three through six).  (Id. at 13-18.)  The Court dismissed

Plaintiffs' state law class action claims without prejudice to pursue the claims in state court.

(Order (Doc. #23) at 2.)  On June 22, 2012, the Court conditionally certified the action as a

representative collective action for the FLSA claims.  (Order (Doc. #41).)

Plaintiffs now move for summary judgment on their 29 U.S.C. § 207 claim for

failure to pay overtime wages against Vision.  Plaintiffs also move for summary judgment

on the issue of whether individual Defendants Javier and Manuel Rodriguez are jointly and

severally liable with Vision for Plaintiffs' damages because they are Plaintiffs' joint

employers.  Vision and Javier and Manuel Rodriguez oppose Plaintiffs' Motion.

## II.  ANALYSIS

Summary judgment is appropriate if the pleadings, the discovery and disclosure

materials on file, and any affidavits "show[] that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the

governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An

issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find

for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th

Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue

of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the

moving party meets its burden, the burden shifts to the non-moving party to produce

evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all

evidence in the light most favorable to the non-moving party.  Id.

### A.    Failure to Pay Overtime (Claim Two)

Plaintiffs move for summary judgment on their 29 U.S.C. § 207 claim against

Vision, arguing Vision violated § 207 by failing to pay overtime to Plaintiffs.  Plaintiffs

further argue that although Vision may not have explicitly requested or authorized

overtime, it permitted it by using a piece rate pay system that implicitly encouraged overtime, having constantly changing work schedules and a lack of supervision at project sites, failing to maintain precise records of Plaintiffs' hours, and permitting irregular payroll practices.  Given the infirmities in Vision's record keeping system and the distribution of pay checks, Plaintiffs argue the Court should allow Plaintiffs to establish damages based on Plaintiffs' estimates of the number of overtime hours they worked for which they were not paid.

Plaintiffs further argue Vision willfully violated the FLSA and therefore the three-year limitations period should apply.  According to Plaintiffs, Vision was aware that piece-rate workers are entitled to overtime as evidenced by Vision's Piece Rate Agreement. Plaintiffs further argue that Javier and Manuel Rodriguez were forced to pay $1.2 million in back wages due to failure to pay overtime and failure to properly record employees' hours at Desert Plastering, a different company the brothers own.  Plaintiffs also argue that pursuant to 29 U.S.C. § 216(b), they are entitled to recover an additional amount of liquidated damages equal to their actual damages for unpaid overtime wages because Vision did not act in subjective good faith and did not have objectively reasonable grounds for believing its conduct complied with the FLSA.

Vision responds that even if there is no reliable record of Plaintiffs' hours, Plaintiffs have not met their prima facie burden of establishing both that they performed work for which they were not properly compensated and the amount and extent of that work to a just and reasonable inference.  Vision further responds that Plaintiffs knew of Vision's overtime policy, Vision's supervisors ensured adherence to the policy, and Vision's supervisors testified Plaintiffs were not working more than forty hours per week for Vision. Thus, to the extent unauthorized, uncompensated overtime work was being performed, Vision argues it was without Vision's knowledge and that Plaintiffs made efforts to avoid detection as evidenced by the fact they did not complain to their supervisors or Vision's

1    office regarding payment issues.

2            Vision further argues that the declarations of other Vision employees show that

3    Vision employees did not work more than forty hours per week and that Plaintiffs'

4    testimony regarding their hours is contradicted by other testimony.  Vision also contends

5    that on the rare occasions Plaintiffs worked overtime, they were paid.  Vision further argues

6    that Plaintiffs do not provide any evidence of the hours they claim to have worked and that

7    Plaintiffs' contradictory statements and generalizations about their hours are not sufficient

8    to meet Plaintiffs' burden at summary judgment.

9            Regarding willfulness and the three year statute of limitations, Vision argues

10   Plaintiffs are not entitled to summary judgment on these issues because they have failed to

11   establish any FLSA violations.  Vision also contends Plaintiffs are not entitled to summary

12   judgment on the issue of liquidated damages because Vision acted in subjective good faith

13   and had objectively reasonable grounds for believing its conduct complied with the FLSA.

14   Specifically, Vision argues it had policies and supervision in place to ensure compliance

15   with the FLSA.

16           Subject to certain exceptions, the FLSA requires employers to pay overtime to

17   employees working more than forty hours in a single work week "at a rate not less than one

18   and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  An

19   employer who violates this section is liable to the affected employees for their unpaid

20   overtime compensation, as well as for an equal amount as liquidated damages.  Id. § 216(b).

21   To establish a claim for denial of overtime compensation under the FLSA, Plaintiffs must

22   prove (1) they were employed by Vision, (2) they were engaged in interstate commerce or

23   in the production of goods for commerce or were otherwise covered by the FLSA in their

24   capacity as employees of Vision, (3) they worked in excess of forty hours in a single work

25   week, and (4) Vision did not pay their overtime compensation.  29 U.S.C. § 207(a)(1); Chao

26   v. Rivendell Woods, Inc., 415 F.3d 342, 343-44, 348 (4th Cir. 2005).

Claims under § 207 seeking overtime compensation require that the employer knew the employee was working uncompensated overtime hours. <u>Forrester v. Roth's I. G. A. Foodliner, Inc.</u>, 646 F.2d 413, 414 (9th Cir. 1981) (stating that the words "suffer" and "permit" in 29 U.S.C. § 203(g)'s definition of "employ" as "to suffer or permit to work" mean "with the knowledge of the employer" (quotation omitted)).  An employer who knows an employee is working overtime "cannot stand idly by" or "deliberately turn[] its back on a situation" and allow an employee to work overtime without compensation, even if the employee does not make a claim for overtime compensation. <u>Id.</u> "However, where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of [§] 207." <u>Id.</u>

Here, Plaintiffs do not point to any evidence in the record that they advised Vision they were working uncompensated overtime hours or that they asked for authorization to work overtime.  In fact, several Plaintiffs testified they did not complain to their supervisors or to Vision's office regarding their payment issues.  Although it is unclear from the record whether Plaintiffs were aware of Vision's written "Employee Overtime Authorization" form that discouraged overtime work and required pre-authorization for overtime hours, Vision supervisors stated in their declarations that they did not allow employees to work unauthorized overtime.  Supervisor Heber Chavez testified that if he was not at a jobsite to enforce the overtime policy, he would call crew members and remind them that they were not to work more than eight hours.

Moreover, supervisors Heber Chavez and Sabino Placido stated in their declarations that they do not remember their crew members working overtime hours. Defendant Javier Rodriguez and supervisors Heber Chavez, Sabino Placido, and Jesus Munoz also stated that given the recent economic recession, work in the construction

industry had been very slow and it would have been difficult for Plaintiffs to get enough hours to be able to work overtime.  Javier Rodriguez further averred that it is difficult to work overtime even when necessary due to hours restrictions at residential job sites. Finally, Vision submitted evidence that Almaraz and Jaime Barraza were paid overtime in 2011, which suggests Vision paid overtime when it was aware its employees had worked overtime hours.

Viewing the facts in the light most favorable to Vision on Plaintiffs' Motion, there remain issues of fact as to whether Vision knew Plaintiffs allegedly worked uncompensated overtime hours.  The Court therefore will deny Plaintiffs' Motion on their § 207 claim.  Given that issues of fact remain as to whether Vision knew of Plaintiffs working uncompensated overtime hours, the Court need not reach the issue of whether Plaintiffs have met their burden of proving they performed work for which they were not properly compensated in violation of § 207 and the amount and extent of that work. Further, the Court need not reach the issues of whether the ordinary two-year limitations period or the three-year limitations period for willful violations of the FLSA applies in this case, or whether Plaintiffs are entitled to liquidated damages pursuant to 29 U.S.C. § 216(b).  The Court therefore will deny Plaintiffs' Motion on these bases.

### B.    Joint Employer/Individual Liability

Plaintiffs also move for summary judgment on the issue of whether Defendants Javier and Manuel Rodriguez are Plaintiffs' joint employers and therefore are jointly and severally liable with Vision for Plaintiffs' damages.  Plaintiffs contend Javier and Manuel Rodriguez are Plaintiffs' joint employers under the "economic reality" test.  Defendants respond that Javier and Manuel Rodriguez are not Plaintiffs' joint employers and that members of a limited liability company are not personally liable for FLSA violations based on their position or title at the company rather than the economic reality of their involvement in the company.

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  An individual is an employer under the FLSA and is subject to liability if he or she "exercises control over the nature and structure of the employment relationship, or economic control over the relationship."  Boucher v. Shaw, 572 F.3d 1087, 1091 (9th Cir. 2009) (quotation omitted) (holding that individual managers were employers under the FLSA); see also Lambert v. Ackerley, 180 F.3d 997, 1011-1012 (9th Cir. 1999) (en banc) (holding that individual defendants who were the chief operating officer and chief executive officer of a corporation were employers under the FLSA).  Moreover, under the FLSA, two or more employers may employ a person jointly.  Bonnette v. Cal. Health & Welfare Agency, 704 F.2d 1465, 1469 (9th Cir. 1983), abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 539 (1985); 29 C.F.R. § 791.2(a).  Each joint employer is individually responsible for complying with the FLSA with respect to the entire employment.  Bonnette, 704 F.2d at 1469 (citing 29 C.F.R. § 791.2(a)).

The Court applies an "economic reality" test to determine whether an individual may be held liable as an employer under the FLSA, as well as to determine whether a joint employment relationship exists.  See Boucher, 572 F.3d at 1090-91 (quotation omitted); Torres–Lopez v. May, 111 F.3d 633, 639 (9th Cir. 1997) (quotation omitted).  Under this test, the Court considers "'whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payment, (3) determined the rate and method of payment, and (4) maintained employment records.'"  Moreau v. Air France, 356 F.3d 942, 946-47 (9th Cir. 2004) (quoting Bonnette, 704 F.2d at 1470).  However, the test is not mechanical and these are not necessarily the only factors the Court should consider.  Bonnette, 704 F.2d at 1470.  Ultimately, the determination is "based upon the circumstances of the whole activity."  Id. (quotation omitted).

Under the FLSA, the definition of "employer" as well as the concept of joint employment are given an "expansive interpretation."  Lambert, 180 F.3d at 1012 (quotation omitted); Torres–Lopez, 111 F.3d at 639.  Whether a party is an employer for purposes of the FLSA is a question of law for the Court, assuming the underlying facts are not disputed.  See Bonnette, 704 F.2d at 1469.

### 1.  Power to Hire and Fire Employees

Although Plaintiffs concede that Javier and Manuel Rodriguez did not personally hire or fire them, Plaintiffs argue Javier and Manuel Rodriguez's power to hire and fire Plaintiffs can be inferred from other aspects of their day-to-day operational control of Vision.  Defendants respond that there is no evidence Javier and Manuel Rodriguez had the power to hire and fire employees besides supervisors.  Defendants further respond that Plaintiffs were hired by Vision supervisors or crew leaders, and that Plaintiffs did not know Javier and Manuel Rodriguez.  Defendants also argue that because Plaintiffs are the moving parties, factual inferences must be drawn in Defendants' favor.  Thus, Defendants argue it is improper for the Court to infer that because Javier and Manuel Rodriguez were involved in other aspects of Vision's day-to-day operations such as securing business and hiring supervisors, they also had the power to hire and fire lower level employees like Plaintiffs.

Plaintiffs do not point to any evidence in the record indicating Javier and Manuel Rodriguez directly hired or fired Plaintiffs.  However, Manuel Rodriguez testified in his deposition that he hired other employees lower level employees.  Specifically, he testified he hired Jesus Munoz, who "was just an employee at the beginning, and because of his capabilities, we move[d] him up to being our field superintendent."  (Pls.' MSJ as to Vision, Ex. T at 28.)  He further testified he hired Sabino Placido, who started off as a "regular employee" working as a painter, and eventually was promoted by Manuel Rodriguez.  (Id. at 29.)  Moreover, the record indicates Javier and Manuel Rodriguez are the ultimate decision makers at Vision, and exercise significant control over Vision's day-to-day

functions such as hiring supervisors, working to obtain new business, communicating with general contractors, and visiting project sites.

In contrast, Defendants point to evidence in the record indicating that some Plaintiffs were hired by Vision supervisors and crew leaders, though Plaintiffs visited Vision's office to fill out employment applications.  Defendants also point to various Plaintiffs' testimony stating that they did not know or speak to Javier and Manuel Rodriguez, however, it is unclear how this evidence bears on the brothers' ability to hire and fire Plaintiffs.  Viewing the facts and drawing all justifiable inferences in the light most favorable to Defendants, given that Manuel Rodriguez actually hired other employees and that Javier and Manuel Rodriguez had the power to hire and fire supervisors, as well as their significant control over other aspects of Vision's day-to-day operations, this factor weighs in favor of finding a joint employment relationship.

2.  Supervise and Control Work Schedules and Conditions of Employment

Plaintiffs concede that Javier and Manuel Rodriguez did not personally set Plaintiffs' work schedules.  However, Plaintiffs argue Javier and Manuel Rodriguez supervised and controlled Plaintiffs' work schedules and conditions of employment because they are responsible for obtaining new business for Vision and communicating with general contractors to put together schedules, to check on projects' progress, or to deal with issues on the project sites.  Plaintiffs further argue that because Javier and Manuel Rodriguez are the qualified individuals on Vision's contractor's license, they are required to exercise regular control over Vision and its employees pursuant to Nevada Revised Statutes § 624.260(3).

Defendants respond that Javier and Manuel Rodriguez's involvement in procuring contracts for Vision does not mean they set Plaintiffs' schedules by ensuring there was work to be performed.  They further argue Javier and Manuel Rodriguez's involvement in working with the general contractors to set the construction schedules does

not mean they dictated when any particular employee would be required to come to work. They also argue the evidence indicates Plaintiffs' work assignments, supervision, and conditions of employment were handled by Vision supervisors, not Javier and Manuel Rodriguez.  As for Plaintiffs' argument regarding Vision's contractor's license, Defendants argue § 624.260(3)(b) provides that the applicant may delegate responsibilities such as hiring, superintending, promoting, transferring, discharging, or disciplining employees.

Plaintiffs provide evidence that Javier and Manuel Rodriguez influenced the general parameters of Plaintiffs' employment by procuring contracts for Vision and working with the general contractors on the overall construction schedules.  However, Plaintiffs do not point to any evidence in the record indicating that Javier and Manuel Rodriguez were involved in scheduling Plaintiffs' hours or that they controlled the day-to-day conditions of Plaintiffs' employment such as giving Plaintiffs work assignments or checking the quality of their work.  To the contrary, the record indicates that Vision supervisors assigned Plaintiffs to specific project sites and oversaw Plaintiffs' work. Specifically, supervisor Heber Chavez gave Perez Cruz work assignments, checked the quality of his work, and "was the person in charge of everything."  (Defs.' Opp'n to Pls.' MSJ, Ex. B at 67-68, 102-103, 108.)  Similarly, other Plaintiffs testified that their supervisors or crew leaders assigned work, checked the quality of their work, and provided tools.  (Defs.' Opp'n to Pls.' MSJ, Ex. C at 46-47, Ex. D at 89-92, Ex. T at 67, Ex. Y at 84.)

This is a close question given Javier and Manuel Rodriguez's daily involvement in Vision's affairs and Manuel Rodriguez's testimony that he and his brother "run the company, both of us."  However, viewing the facts and drawing all justifiable inferences in the light most favorable to Defendants, issues of fact remain as to whether Javier and Manuel Rodriguez supervised and controlled Plaintiffs' work schedules and conditions of employment.  Thus, this factor weighs against finding a joint employment relationship.
/ / /

### 3.  Rate and Method of Payment

Plaintiffs argue Javier and Manuel Rodriguez are responsible for Plaintiffs' rate and method of pay because the brothers decided to pay Plaintiffs by the piece and because they have the power to change the piece rate.  Defendants respond that multiple individuals, including Vision's estimator and Mimi Gaumond, were involved in the setting of piece rates and that Javier and Manuel Rodriguez were only two corporate actors in a larger process. They further respond that various Plaintiffs testified it was their crew leaders who determined their pay by paying Plaintiffs in cash or deciding what Plaintiffs would be paid on a daily basis.

Viewing the facts and drawing all justifiable inferences in the light most favorable to Defendants, this factor weighs in favor of a finding of joint employment relationship.  The evidence indicates that Javier and Manuel Rodriguez were responsible for the decision to pay Plaintiffs by the piece.  In both his deposition and his declaration, Javier Rodriguez stated that he prefers the piece rate system because employees tend to work more steadily and do not need to be supervised constantly.  The record further indicates that piece rates were set by Javier or Manuel Rodriguez, Mimi Gaumond, or Vision's "estimator." Focusing on the totality of the circumstances and the economic reality of the situation, the fact that Javier and Manuel Rodriguez chose the piece rate system and determined the piece rates indicates they yielded significant control over what Plaintiffs were paid.

Defendants point to evidence in the record indicating that other factors determined Plaintiffs' pay.  For instance, Almaraz stated he never received paychecks; instead, his crew leader Celestino Monterrosas Silva would cash crew members' paychecks, keep a portion of the checks for income tax, and then pay them what he thought they deserved.  Almaraz further stated he did not receive the amount he was promised for the Perry Plaza project because a percentage of his pay had to be given to various Vision supervisors and crew leaders.  Perez Cruz stated that he and his crew members received

paychecks made out to other people, cashed the paychecks at a liquor store, pooled the money, and then divided it in equal parts among the crew members.  Some other Vision crew members also would cash their own checks, pool the money, and then divide it equally amongst themselves.  Further, although each house had a price based on the piece rate system, supervisor Heber Chavez testified that the crew members decided how the money was going to be divided amongst themselves based on the hours each crew member worked.  Although the amount of money Plaintiffs ultimately received may had varied due to these factors, it does not change the fact that Javier and Manuel Rodriguez determined the rate and method of payment at Vision.  Thus, this factor weighs in favor of finding a joint employment relationship.

4.  Maintain Employment Records

Plaintiffs argue Javier and Manuel Rodriguez maintained employment records because they delegated payroll duties to Vision's controller, Mimi Gaumond.  Defendants respond that although an employer may not delegate certain management duties to others, Javier and Manuel Rodriguez are not employers under the FLSA, and therefore never were entrusted with the burden of maintaining employment records in the first place.

The parties do not point to specific evidence in the record regarding Javier and Manuel Rodriguez's involvement in maintaining employment records.  The only evidence in the record concerning employment records is the evidence indicating that Mimi Gaumond is responsible for Vision's payroll, Mimi Gaumond's testimony that Vision did not begin tracking its employees' hours until 2012, and evidence regarding Vision's current procedure for tracking hours.  Thus, this factor is neutral.  See Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1028-31 (9th Cir. 2001) (stating that a court need not "comb the record" looking for a genuine issue of material fact if the party has not brought the evidence to the court's attention) (quotation omitted)).

Although the issue of joint employment is a question of law for the Court, it must

be based on the underlying facts.  <u>Bonnette</u>, 704 F.2d at 1469.  Considering the totality of the circumstances and the economic reality of the relationship between Plaintiffs and Javier and Manuel Rodriguez, and viewing all facts and drawing all inferences in favor of Javier and Manuel Rodriguez as the non-moving parties, material issues of fact remain regarding the economic and workplace realities of the parties' relationship.  This is a close question which ultimately will depend upon credibility determinations by the trier of fact.  In the Court's view, absent additional evidence, the trier of fact could reasonably find Javier and Manuel Rodriguez were Plaintiffs' joint employers.  However, given the relative paucity of Plaintiffs' evidence, credibility issues, and the fact that the summary judgment standard requires the Court to construe the evidence in favor of Javier and Manuel Rodriguez, the Court will deny Plaintiffs' Motion for Summary Judgment on this issue.

**III. CONCLUSION**

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment as to Vision Drywall & Paint, LLC and Individual Defendants (Doc. #75) is hereby DENIED.

IT IS FURTHER ORDERED that the Clerk of Court shall seal Plaintiffs' Motion for Summary Judgment as to Vision Drywall & Paint, LLC and Individual Defendants (Doc. #75) in its entirety.  Plaintiffs' counsel shall re-file the entire Motion, including all exhibits, with appropriate redactions to all exhibits, for the public record in accordance with Special Order No. 108 within seven (7) days from the date of this Order.


DATED: May 15, 2014



_____
PHILIP M. PRO
United States District Judge