1

2

3

4              UNITED STATES DISTRICT COURT

5                    DISTRICT OF NEVADA

6                            * * *

7   OSCAR ALMARAZ, et al.,            )
                                      )
8              Plaintiffs,            )
                                      )        2:11-CV-01983-PMP-PAL
9   v.                                )
                                      )
10  VISION DRYWALL & PAINT, LLC, et   )        ORDER
    al.,                              )
11                                    )
               Defendants.            )
12  _____ )

13          Presently before the Court is Defendants Las Vegas Land Contracting LLC d/b/a

14  Dunhill Homes ("Dunhill"); Burke Construction Group, Inc. ("Burke"); Richmond

15  American Homes of Nevada, Inc. ("Richmond American"); Harmony Homes, Inc.

16  ("Harmony"); Desert Wind Homes of Nevada II, Inc. d/b/a Russell Rogers Development

17  ("Desert Wind"); KB Home Las Vegas, Inc. and KB Home Nevada, Inc.'s (together, "KB

18  Homes") (collectively, the "General Contractor Defendants") Motion for Summary

19  Judgment (Doc. #76), filed on March 21, 2013.  Plaintiffs filed a Response (Doc. #85) on

20  April 29, 2013.  The General Contractor Defendants filed a Reply (Doc. #88) on May 6,

21  2013.

22          Also before the Court is Plaintiffs' Motion for Summary Judgment as to General

23  Contractor Defendants (Doc. #77), filed on March 21, 2013.  The General Contractor

24  Defendants filed a Response (Doc. #84) on April 29, 2013.  Plaintiffs filed a Reply (Doc.

25  #90) on May 16, 2013.

26  / / /

## I. BACKGROUND

The parties are familiar with the facts of this case, and the Court will not repeat them here except where necessary.  Named Plaintiffs Oscar Almaraz ("Almaraz"), Ismael Perez Cruz ("Perez Cruz"), and Efren Gonzalez are drywall laborers who brought this action on behalf of themselves and other similarly situated current and former employees of Defendant Vision Drywall & Paint, LLC ("Vision") for alleged Fair Labor Standards Act ("FLSA") and Nevada state law wage and hour violations.  Twenty-four other employees filed opt-in consents with the Court.  (Notice of Filing Opt-In Consent Forms (Doc. ##9, 15, 37, 38, 39, & 63).)  One of the named Plaintiffs, Efren Gonzalez, and four of the opt-in Plaintiffs subsequently were dismissed from the case, resulting in a total opt-in class of twenty-two Plaintiffs.  (Order (Doc. #70); Order (Doc. #73).)

The General Contractor Defendants are various general contractors who subcontracted with Vision for drywall installation and finishing services.  (Compl. at ¶¶ 19-25; Answer at ¶¶ 19-25; Pls.' Mot. for Summ. J. as to General Contractor Defs. (Doc. #77) ["Pls.' MSJ as to General Contractor Defs."], Exs. A, G, Q, V, Z, CC.)  Plaintiffs allege that they worked on the General Contractor Defendants' projects and that the General Contractor Defendants, along with Vision, were Plaintiffs' joint employers.  (Compl. at ¶¶ 43, 45, 47, 49, 51, 53, 55.)  Specifically, Plaintiffs allege the General Contractor Defendants "oversaw Plaintiffs' work on jobsites, established Plaintiffs' production schedules, and monitored Plaintiffs' daily work progress." (Id.)

Plaintiffs further allege that while employed by Vision to work on the General Contractor Defendants' projects, Plaintiffs were not paid the minimum wage, were not paid overtime, and were promised a certain rate of pay but were paid another.  (Id. at ¶¶ 3, 5, 8, 10, 56-59, 63-65, 68-101.)  Plaintiffs also allege there were various irregularities with respect to Vision's payroll practices, including Vision's failure to record Plaintiffs' hours and to issue paychecks made out to the appropriate employees in the appropriate amounts.

(Id. at ¶¶ 6-7, 11.)

Almaraz and Perez Cruz testified that while employed by Vision, they worked on various General Contractor Defendants' projects including Foxborough, Tiara, Glengarry, Perry Plaza, Meyers, Vista Villa, and Monticello.  (General Contractor Defs.' Mot. Summ. J. (Doc. #76) ["Defs.' MSJ"], Ex. B at 105-06, Ex. C at 73-74.)  However, Almaraz and Perez Cruz were unable to recall all of the projects that they worked on during their employment at Vision.  (Defs.' MSJ, Ex. B at 102, 114, Ex. C at 71-73, 93.)  Almaraz and Perez Cruz also were unable to recall when or for how long they worked on particular projects.  (Defs.' MSJ, Ex. B at 113, 133-34, 140-41, 143, Ex. C at 66-67, 71-76, 80-81.)  They testified it was common to work on different projects within the same week, and sometimes even within the same day.  (Defs.' MSJ, Ex. B at 106-7, 113, Ex. C at 73-74.)  According to the General Contractor Defendants, none of them was the general contractor for the Meyers, Vista Villa, or Monticello projects.  (Defs.' MSJ, Ex. N at ¶ 4, Ex. O at ¶ 5, Ex. P at ¶ 5, Ex. Q at ¶ 5, Ex. R at ¶ 5, Ex. S at ¶ 5.)

In their depositions, some of the opt-in Plaintiffs also were unable to identify which General Contractor Defendant was associated with particular projects on which Plaintiffs worked.  (Defs.' MSJ, Ex. E at 62-63, Ex. F at 61-62, Ex. G at 51-52, Ex. H at 47, 79.)  However, Plaintiffs submit a spreadsheet and attach time sheets[1] showing that certain Plaintiffs worked on certain General Contractor Defendants' projects.[2]  (Resp. to Defs.'

---

[1] Plaintiffs attach three of Almaraz's time sheets, two of Perez Cruz's time sheets, and one of Leonardo Portugues's time sheets.  (Pls.' MSJ as to General Contractor Defs., Ex. J.)  One of the time sheets also mentions Raol Castro, but he is not a Plaintiff in this case.  (Id. at VDP002826.)

[2] The spreadsheet matches Plaintiffs Almaraz, Perez Cruz, Jose Palacio, Leonardo Portugues, Christian Lomeli, Porfirio Pamplona, Cruz Rodriguez, Jaime Magallanes, Jaime Barraza, Jose Garcia Cruz, German Bravo, and Erik Demha Roque with particular General Contractor Defendants' projects.  Compare Resp. to Defs.' Mot. for Summ. J. (Doc. #85) ["Resp. to Defs.' MSJ"], Ex. A (listing Plaintiffs, projects, and General Contractor Defendants) with Pls.' MSJ as to General Contractor Defs., Exs. K-P at Resp. to Interrog. 2 (listing projects on which the General Contractor Defendants subcontracted with Vision).

1  Mot. for Summ. J. (Doc. #85) ["Resp. to Defs.' MSJ"], Ex. A; Pls.' MSJ as to General

2  Contractor Defs., Ex. J, Exs. K-P at Resp. to Interrog. 2.)

3        Plaintiffs brought suit against Defendants, alleging collective action claims under

4  the FLSA, 29 U.S.C. §§ 206 and 207, for failure to pay minimum wages and overtime

5  wages (counts one and two).  (Compl. at 11-13.)  Plaintiffs also alleged Nevada state law

6  class action claims to recover wages, overtime wages, and waiting time penalties, and for

7  breach of contract (counts three through six).  (Id. at 13-18.)  On March 5, 2012, the Court

8  dismissed Plaintiffs' state law class action claims without prejudice to pursue the claims in

9  state court.  (Order (Doc. #23) at 2.)[3]  On June 22, 2012, the Court conditionally certified

10 the action as a representative collective action for the FLSA claims.  (Order (Doc. #41).)

11       Plaintiffs now move for summary judgment on the issue of whether Vision and

12 the General Contractor Defendants are Plaintiffs' joint employers.  The General Contractor

13 Defendants oppose Plaintiffs' Motion and countermove for summary judgment on the same

14 issue.  The General Contractor Defendants also move to dismiss from this case opt-in

15 Plaintiffs Jaime Magallanes-Munoz and Francisco Cervantes for failure to properly file

16 consent forms.

17 / / /

18 / / /

19

20 ――――――――――――

21     Although the spreadsheet lists the projects on which Plaintiffs Miguel Corona, Rolando
   Fernandez, Raul de la Cruz, Victor Saucedo, and Joel Solis worked, it does not match those projects

22 with any particular General Contractor Defendant, and the General Contractor Defendants do not list
   these as projects on which they subcontracted with Vision. (Resp. to Defs.' MSJ, Ex. A at 8-10; Pls.'

23 MSJ as to General Contractor Defs., Exs. K-P at Resp. to Interrog. 2.)  The spreadsheet does not
   contain any information regarding Plaintiffs Alfonso Viveros Cordova, Faustino Martinez Querino,

24 Eduardo Hernandez Contreras, or Isais Diaz.  Finally, it is unclear whether Jose Barran, who is listed
   on the spreadsheet, is the same person as Plaintiff Jose Barragan. (Resp. to Defs.' MSJ, Ex. A at 5.)

25

26    [3] Given that Plaintiffs' state law claims have been dismissed and are no longer pending before
   this Court, the Court will not address the parties' arguments regarding the state law claims.

## II.  ANALYSIS

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

### A.     Joint Employer

Plaintiffs move for summary judgment on the issue of whether Vision and the General Contractor Defendants are Plaintiffs' joint employers.  Plaintiffs argue the General Contractor Defendants are Plaintiffs' joint employers as a matter of law under the factors set forth in Bonnette v. California Health and Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983), abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 539 (1985), and in Torres-Lopez v. May, 111 F.3d 633, 639-40 (9th Cir. 1997).  The General Contractor Defendants oppose Plaintiffs' Motion and countermove for summary judgment on the same issue.  The General Contractor Defendants argue the Torres-Lopez factors do not apply in this case.  They further argue Plaintiffs have failed to present evidence establishing the General Contractor Defendants were Plaintiffs' joint employers under the Bonnette or the Torres-Lopez factors.

/ / /

5

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Under the FLSA, two or more employers may employ a person jointly. Bonnette, 704 F.2d at 1469; 29 C.F.R. § 791.2(a). Each joint employer is individually responsible for complying with the FLSA with respect to the entire employment. Bonnette, 704 F.2d at 1469 (citing 29 C.F.R. § 791.2(a)).

The Court applies an "economic reality" test to determine whether a joint employment relationship exists. Torres-Lopez, 111 F.3d at 639 (quoting Bonnette, 704 F.2d at 1470). Under this test, the Court considers "'whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payment, (3) determined the rate and method of payment, and (4) maintained employment records.'" Moreau v. Air France, 356 F.3d 942, 946-47 (9th Cir. 2004) (quoting Bonnette, 704 F.2d at 1470) (collectively, the "Bonnette factors"). The economic reality test is not mechanical and the Bonnette factors are not necessarily the only factors the Court should consider. Id. Ultimately, the determination is "based upon the circumstances of the whole activity." Bonnette, 704 F.2d at 1470 (quotation omitted).

Other factors courts have considered in evaluating whether a joint employment relationship exists include, but are not limited to:

> (1) whether the work was a specialty job on the production line; (2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes; (3) whether the premises and equipment of the employer are used for the work, (considering the alleged employee's investment in equipment or materials required for his task, or his employment of helpers); (4) whether the employees had a business organization that could or did shift as a unit from one [worksite] to another; (5) whether the work was piecework and not work that required initiative, judgment or foresight (considering whether the service rendered requires a special skill); (6) whether the employee had an opportunity for profit or loss depending upon [the alleged employee's] managerial skill; (7) whether there was permanence [in] the working relationship; and (8) whether the service rendered is an integral part of the alleged employer's business.

Torres-Lopez, 111 F.3d at 640 (internal quotations omitted) (collectively, the "Torres-Lopez factors"); see also Moreau, 356 F.3d at 947-48, 951-52 (applying the Torres-Lopez factors in addition to the Bonnette factors in determining whether a joint employment relationship existed under the Family Medical Leave Act); Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d Cir. 2003) (listing similar factors). Both direct and indirect control may demonstrate joint employment. Torres-Lopez, 111 F.3d at 643.

Under the FLSA, the definition of "employer" is given an "expansive interpretation." Torres-Lopez, 111 F.3d at 639. Whether a party is an employer for purposes of the FLSA is a question of law for the Court, assuming the underlying facts are not disputed. See Bonnette, 704 F.2d at 1469. The Court may find no joint employment even if some factors weigh in favor of finding a joint employment relationship. Zheng, 355 F.3d at 76-77.

Here, the General Contractor Defendants argue there is no binding authority requiring the Court to apply the Torres-Lopez factors in addition to the Bonnette factors because in Torres-Lopez, the Ninth Circuit was considering joint employment under the Migrant and Seasonal Agricultural Worker Protection Act. The Court need not reach the issue of whether the Torres-Lopez factors apply in addition to the Bonnette factors in this case. Even if the Court applies the expanded Torres-Lopez factors, the General Contractor Defendants are not joint employers under the totality of the circumstances and the economic reality of the situation.

### 1. Bonnette Factors

#### a. Power to Hire and Fire Employees

Plaintiffs argue the General Contractor Defendants had the power to hire and fire them under various clauses in the subcontract agreements between Vision and the General Contractor Defendants. Specifically, Plaintiffs argue the provisions of the subcontract agreements that allow certain General Contractor Defendants to reduce or cancel Vision's

scope of work or to take over Vision's work give the General Contractor Defendants the power to hire and fire Plaintiffs because the General Contractor Defendants could reduce or eliminate Vision's employees from projects.  They further argue the General Contractor Defendants' ability to eject Plaintiffs from a project due to a safety or other violation "is the functional equivalent of firing a worker from a project."  (Pls.' MSJ as to General Contractor Defs. at 6.)

The General Contractor Defendants argue the provisions of the subcontract agreements which permit them to reduce or cancel Vision's scope of work do not give them the authority to hire or fire individual employees, such as Plaintiffs.  The General Contractor Defendants argue that at most, these provisions permit them to alter Vision's scope of work in accordance with project demands.  They further argue that basic principles of construction management dictate that if Vision were unable to perform under a subcontract, and a General Contractor Defendant was forced to hire employees to complete Vision's work, there is no requirement that it employ Vision employees.

Regarding Plaintiffs' argument they could be expelled from a job site for safety violations, the General Contractor Defendants respond that expulsion from a particular job site is not tantamount to termination because the individual still would remain a Vision employee.  The General Contractor Defendants also argue that they had no disciplinary procedures in place with respect to subcontractors' employees and that it was up to the individual subcontractors to maintain safety policies and procedures.  Finally, the General Contractor Defendants argue that limited oversight of workplace safety is insufficient to establish joint employment.

Plaintiffs do not point to any evidence in the record indicating the General Contractor Defendants actually hired or fired Plaintiffs.  The General Contractor Defendants state in their declarations they did not have the power to hire or fire Plaintiffs. (Defs.' MSJ, Ex. N at ¶ 5, Ex. O at ¶ 6, Ex. P at ¶ 6, Ex. Q at ¶ 6, Ex. R at ¶ 6, Ex. S at ¶ 6.)

Various Plaintiffs testified in their depositions that the General Contractor Defendants did not have discussions with them regarding hiring or firing.  (Defs.' MSJ, Ex. B at 152, Ex. D at 91, Ex. G at 57, Ex. M at 83-84.)  Some Plaintiffs also testified they did not recall ever speaking with one of the General Contractor Defendants' supervisors or employees, with the exception of one Plaintiff who recalled discussing safety issues with one of the General Contractor Defendants' employees.  (Defs.' MSJ, Ex. C at 107; Ex. E at 86; Ex. F at 68; Ex. G at 57; Ex. H at 72; Ex. I at 68-69; Ex. J at 75; Ex. L at 70-71; Ex. M at 82-83.)

Moreover, Plaintiffs do not point to any evidence in the record indicating the General Contractor Defendants disciplined Plaintiffs or had disciplinary procedures in place for Vision's employees.  However, there is evidence indicating that if an employee committed a serious safety violation, the employee would be asked to leave a project site.  Defendant Burke's Rule 30(b)(6) witness testified that Burke did not have disciplinary procedures in place for subcontractors' employees, but if a subcontractor's employee commits a safety violation "placing himself or anybody else in imminent danger, he's asked to leave."  (Pls.' MSJ as to General Contractor Defs., Ex. B at 42.)  If imminent danger is not involved, the representative testified that someone from Burke would go directly to the subcontractor's foreman or supervisor and advise them to take action.  (Id.)  He further testified that "[w]hen Burke supervision was not on-site, [subcontractors] could not be on-site."  (Id. at 26.)  Heber Chavez similarly testified that the General Contractor Defendants' supervisors would talk to the workers "[w]hen they don't follow the rules . . . wearing the helmets or OSHA, yes, safety."  (Pls.' MSJ as to General Contractor Defs., Ex. C at 76-77.)

Although the General Contractor Defendants could expel Vision employees from job sites or discipline them for safety violations, there is evidence in the recording indicating it was Vision's responsibility to oversee and discipline its employees.  Specifically, Desert Winds' representative testified that although its employees "would probably mention something" if they observed unsafe behavior at a project, "it's up to

individual companies to oversee their own safety."  (General Contractor Defs.' Opp'n to Pls.' Mot. for Summ. J. as to General Contractor Defs. (Doc. #84) ["General Contractor Defs.' Opp'n to Pls.' MSJ"], Ex. B at 16-17, 19-20; Pls.' MSJ as to General Contractor Defs., Ex. H at 16-17.)  Other General Contractor Defendants' representatives similarly testified that when there was a disciplinary or workplace safety issue, such matters were brought to the attention of the subcontractor's supervisor or foreman for handling. (General Contractor Defs.' Opp'n to Pls.' MSJ, Ex. A at 42, Ex. C at 31, 34, Ex. D at 20.) KB Homes' representative testified that "if somebody forgot to put their hard hat on after exiting their truck and I see that, I would just ask them to put their hat on.  I wouldn't necessarily document it."  (General Contractor Defs.' Opp'n to Pls.' MSJ, Ex. D at 33.) Although he stated he would document more severe issues, such as a fistfight, he never had to do so for Vision's employees.  (Id.)

Further, the subcontract between Burke and Vision allows Burke to reduce or omit Vision's scope of work or to furnish employees to complete a project if Vision fails to perform under a subcontract.  (Pls.' MSJ as to General Contractor Defs., Ex. A at §§ 5(k), 6(b).)  Similarly, the Desert Winds subcontract allows Desert Winds to furnish employees to complete a project if Vision fails to do so.  (Pls.' MSJ as to General Contractor Defs., Ex. G at § 21(a)(1).)  The Desert Winds and Richmond American subcontracts allow them to terminate Vision's services, "at any time and for any reason" or "for no reason."  (Pls.' MSJ as to General Contractor Defs., Ex. G at § 21(c), Ex. CC at Art. 7.1.)  The Dunhill Homes and Harmony subcontracts allow them to suspend Vision's work upon written notice.  (Pls.' MSJ as to General Contractor Defs., Ex. Q at § 6.1, Ex. V at § 6.1.)

With respect to individual employees, the KB Homes subcontract provides that it "may require [Vision] to remove from the Project Site such employees . . . as [KB Homes] deems incompetent, careless, insubordinate or otherwise objectionable, or whose continued employment in connection with the [w]ork is deemed by [KB Homes] to be contrary to [KB

Homes'] best interests or the public interest."  (Pls.' MSJ as to General Contractor Defs., Ex. Z at KBHome00046.)  Similarly, the Richmond American subcontract states that if it "determines that any Agent is incompetent, disorderly, unreliable, or that such Agent's conduct is detrimental to the satisfactory performance of the Work . . . , and upon notice from [Richmond American] of such determination, [Vision] shall immediately remove the Agent from the Construction Site and replace the Agent by the next business day."  (Pls.' MSJ as to General Contractor Defs., Ex. CC at Art. 3.3.2.)

Although Plaintiffs have produced evidence that certain General Contractor Defendants could reduce or cancel Vision's work or provide additional workers if Vision failed to perform under the subcontracts, the practical result of these contractual clauses is that Vision's scope of work would be altered, not that Plaintiffs no longer would be Vision employees.  The same analysis holds true for the contractual clauses that allow General Contractor Defendants to expel Vision's workers from a job site under certain circumstances.  Similarly, the fact that a General Contractor Defendant would speak to and possibly expel from a job site a worker who committed a serious safety violation does not give the General Contractor Defendants the power to hire or fire Plaintiffs.  There is no evidence in the record indicating that if a Plaintiff was removed from one of the General Contractor Defendant's job sites for any of these reasons the Plaintiff necessarily would be fired by Vision or would not be able to work on another project.  The Plaintiffs testified it was common to work on different projects for different General Contractor Defendants within the same week, and sometimes even within the same day.  Instead, the evidence indicates that Vision was responsible for dealing with its employees' disciplinary or safety issues.  Thus, this factor weighs against finding a joint employment relationship.

///

///

///

b.  Supervise and Control Work Schedules and Conditions of Employment

Plaintiffs argue the General Contractor Defendants controlled Plaintiffs' work schedules because the General Contractor Defendants set permissible working hours on their job sites and were in regular communication with Vision regarding the projects' general production schedule, which impacted Vision's staffing needs.  Plaintiffs further argue the General Contractor Defendants controlled the conditions of Plaintiffs' employment by instructing Vision on how it should allocate workers within projects and by controlling the types of materials Vision used on the projects.

The General Contractor Defendants argue Plaintiffs do not provide any evidence indicating they set Plaintiffs' individual schedules.  The General Contractor Defendants further argue that setting the general job site hours and communicating with Vision regarding the master construction schedule is part of a general contractor's role in managing a construction project.  The General Contractor Defendants also argue that although Vision supervisor Heber Chavez testified he regularly communicated with the General Contractor Defendants regarding schedules, at most, his testimony indicates they discussed project schedules in a general sense, not that they regularly communicated regarding Vision's staffing needs.

Regarding the argument that the General Contractor Defendants controlled Plaintiffs' conditions of employment by directing Vision to shift its crews from one section of a project to another, the General Contractor Defendants argue it is the traditional role of a general contractor to suggest to subcontractors that workers be assigned to certain locations within the project based on what needs are most pressing and the progress of the project as a whole.  The General Contractor Defendants argue Plaintiffs present no evidence that the General Contractor Defendants assigned specific tasks in specific locations to specific Plaintiffs.  Finally, as to their review and approval of construction

materials, the General Contractor Defendants argue that as general contractors, they have an interest in ensuring the materials used by subcontractors are of the requisite quality to comply with project specifications, and that there is no evidence they communicated approval or disapproval of materials to individual Plaintiffs, rather than to Vision.

Plaintiffs do not point to any evidence in the record indicating the General Contractor Defendants directly set individual Plaintiffs' work schedules. However, various subcontract agreements set permissible working hours on job sites as well as the projects' production schedules. (Pls.' MSJ as to General Contractor Defs., Ex. A, Attach. A at Item 29, Ex. G at § 17(b), Ex. Q at § 2.3, Ex. Z at § 17(a), Ex. CC at Art. 4.1.1.) Some of the subcontracts further provide that Vision must employ an increased work force and/or require its employees to work overtime to meet the General Contractor Defendants' scheduling requirements. (Pls.' MSJ as to General Contractor Defs., Ex. Q at § 2.3, Ex. V at § 2.3, Ex. Z at § 20(d).) Plaintiffs also provide evidence that the General Contractor Defendants' superintendents would communicate regularly with Vision regarding project schedules. (Pls.' MSJ as to General Contractor Defs., Ex. B at 46, Ex. C at 76, Ex. H at 25, 28.) Vision supervisor Heber Chavez testified that he spoke to the General Contractor Defendants' superintendents "[g]enerally every day" and that the superintendents were responsible for "schedules, inspections, checking on the work, how is it done, seeing any problems, then they call [him] . . . ." (Pls.' MSJ as to General Contractor Defs., Ex. C at 76, 78-79.)

In contrast, the General Contractor Defendants aver they did not control Plaintiffs' work schedules. (Defs.' MSJ, Ex. N at ¶ 6, Ex. O at ¶ 7, Ex. P at ¶ 7, Ex. Q at ¶ 7, Ex. R at ¶ 7, Ex. S at ¶ 7.) Plaintiffs Almaraz, Jose Palacio, Christian Lomeli, and Jaime Magallanes-Munoz similarly testified in their depositions they did not receive schedules from a general contractor. (Defs.' MSJ, Ex. E at 87, Ex. L at 72, Ex. M at 84; General Contractor Defs.' Opp'n to Pls.' MSJ, Ex. G at 153.) Vision supervisor Heber

Chavez testified he would speak to Vision's crew leaders daily about which project the crews should work on based on the number of workers needed.  (Pls.' Mot. for Summ. J. as to Vision Drywall & Paint, LLC & Individual Defs. (Doc. #75) ["Pls.' MSJ as to Vision"], Ex. Q at 39-40.)  Mimi Gaumond further testified Vision makes decisions regarding the scheduling of workers based on information it receives from general contractors:

> whatever schedule the general contractor gives the subcontractor, Vision, we have to meet that schedule. . . . [I]f it's a big home and they're wanting us to do it in two days, but we know, on an average, it may take two and a half . . . we're going to make sure that we send a big crew, not a small crew.  So instead of having just four people on this house, we need a crew of six guys to make sure that we can meet that deadline . . . .

(Pls.' MSJ as to Vision, Ex. R at 43.)  She also testified "[t]here are no set working hours for the crews . . . they pretty much set their own schedule, their own time frame.  They work the hours they basically want to work."  (Id. at 45.)

As for conditions of employment, Burke's superintendents would direct Vision to shift its crews from one section of a project to another based on what needs were the most pressing, and the Dunhill and Harmony subcontracts provide that they may "change [w]ork sequences and priorities."  (Pls.' MSJ as to General Contractor Defs., Ex. B at 45-46, Ex. Q at § 2.3, Ex. V at § 2.3; General Contractor Defs.' Opp'n to Pls.' MSJ, Ex. A at 46.)  Some of the General Contractor Defendants would review and approve construction materials, such as paint and drywall, before Vision was allowed to use them, or would require that Vision use specific types of materials.  (Pls.' MSJ as to General Contractor Defs., Ex. B at 22-23, Ex. Q at Dunhill000140, Ex. AA at § 9, Ex. CC at Arts. 3.4.4, 4.4.)  Some of the subcontracts also set forth detailed policies regarding customer service, safety, drug testing, parking, cleanup specifications, and quality control checklists with respect to certain projects.  (Pls.' MSJ as to General Contractor Defs., Ex. G at DesertWind000028, Ex. Q at §§ 2.10, 2.13, Ex. S, Ex. T, Ex. V. at §§ 2.10, 2.13, Ex. W, Ex. Z at KBHome000043-48, Ex. AA at § 8.)

The General Contractor Defendants, however, aver they did not supervise or control the performance of Plaintiffs' work, including giving them assignments or disciplining them.  (Defs.' MSJ, Ex. N at ¶ 7, Ex. O at ¶ 8, Ex. P at ¶ 8, Ex. Q at ¶ 8, Ex. R at ¶ 8, Ex. S at ¶ 8, Ex. V. at 42, Ex. W at 34, Ex. X at 22-23, Ex. Y at 26-27.)  Various Plaintiffs stated they received their work assignments from Vision supervisor Heber Chavez or Celestino Monterrosas Silva.  (Defs.' MSJ, Ex. T, Ex. U; Defs.' Opp'n to Pls.' Mot. for Summ. J. (Doc. #86) ["Defs.' Opp'n to Pls.' MSJ"], Ex. B at 21-22, 40, Ex. C at 46-47, Ex. T at 67, Ex. Y at 84.)  Plaintiffs Perez Cruz and Jose Palacio also testified they did not receive assignments from the General Contractor Defendants.  (General Contractor Defs.' Opp'n to Pls.' MSJ, Ex. H at 109, Ex. J at 87.)  Plaintiffs Christian Lomeli and Porfirio Pamplona Santos testified that general contractors did give them assignments or discipline them.  (Defs.' MSJ, Ex. K at 84, Ex. M at 83-84.)  Plaintiff Raul de la Cruz Rodriguez similarly stated that Vision supervisor Heber Chavez was the only person who checked his work to make sure it was being done correctly.  (Defs.' MSJ, Ex. F at 67.)  When asked in his deposition whether a general contractor ever told him or a member of his crew that they were not doing their work correctly, Plaintiff Erik Demha Roque answered "no."  (Defs.' MSJ, Ex. H at 73.)  Erik Demha Roque further testified he did not receive an assignment from a General Contractor Defendant.  (General Contractor Defs.' Opp'n to Pls.' MSJ, Ex. M at 72.)  Vision supervisors also averred they were responsible for the day-to-day operation of their crews.  (Defs.' Opp'n to Pls.' MSJ, Ex. G at ¶ 2, Ex. H at ¶ 2, Ex. I at ¶ 2.)

The General Contractor Defendants communicated regularly with Vision regarding project schedules and set the master construction schedules and job site hours, thereby indirectly controlling Plaintiffs' working hours by setting overarching start and finish dates for projects and limiting job site working hours.  However, there is no evidence indicating the General Contractor Defendants had the power to set individual Plaintiffs'

schedules.  Instead, Plaintiffs received their schedules from Vision or set their own hours.  Further, although the General Contractor Defendants directed Vision to shift its crews to particular locations on project sites, thereby indirectly impacting Plaintiffs' conditions of employment, Plaintiffs uniformly testified that they received their individual daily work assignments from Vision.

The General Contractor Defendants were, as a general matter, specific about how they wanted work performed, as evidenced by the fact the subcontracts included quality control checklists and specifics regarding the type of materials to be used.  However, much of the indirect supervision or control exercised by the General Contractor Defendants was to ensure compliance with project specifications.  See Moreau, 356 F. 3d at 951 (stating that checking to ensure standards are met and that performance adhered to specifications is a form of indirect supervision or control, but does not amount to control sufficient to establish joint employment).  Plaintiffs uniformly testified Vision supervised Plaintiffs and provided them with feedback regarding their work.  Finally, the evidence in the record indicates the General Contractor Defendants gave orders only to Vision supervisors, not directly to workers like Plaintiffs.

Taken together, this evidence indicates that the General Contractor Defendants had some measure of indirect control over Plaintiffs' work schedules and conditions of employment.  While excessive indirect control may demonstrate joint employment, viewing the economic reality of the circumstances as a whole, the record indicates that Vision, not the General Contractor Defendants, exerted day-to-day control over Plaintiffs' work schedules and conditions of employment, including giving Plaintiffs assignments and checking Plaintiffs' work.  Thus, this factor weighs against finding a joint employment relationship.

### c.  Rate and Method of Payment

Based on various provisions in the subcontracts, Plaintiffs contend the General

Contractor Defendants dictated their rates of pay.  Specifically, Plaintiffs argue the subcontracts required Vision to pay its employees, required Vision to provide notice of payment to the General Contractor Defendants, allowed the General Contractor Defendants to withhold certain percentages of Vision's invoices to ensure employees had been properly paid, and allowed the General Contractor Defendants to contact Plaintiffs directly to make sure they had been paid.  Plaintiffs also argue the General Contractor Defendants dictated their rates of pay because Perry Plaza, one of Burke's projects, was a prevailing wage project requiring Plaintiffs to be paid in accordance with the Davis-Beacon Act.

The General Contractor Defendants argue the provisions in the subcontract regarding payment merely instruct Vision to ensure prompt payment of its employees and suppliers.  The General Contractor Defendants further argue Plaintiffs provide no evidence indicating the General Contractor Defendants instructed Vision to pay Plaintiffs a specific rate, or issued paychecks or W-2s to Plaintiffs.  With respect to the Perry Plaza project, the General Contractor Defendants argue that because one of Burke's projects fell under the Davis-Beacon Act, it does not mean Burke dictated Plaintiffs' rates of pay.  Instead, Burke contends it merely informed Vision what the project requirements were under the law.

There is no evidence in the record indicating the General Contractor Defendants were responsible for paying Plaintiffs or that Plaintiffs negotiated their pay rates with the General Contractor Defendants.  Desert Winds' representative testified it "didn't oversee how [Vision] paid [its] employees."  (General Contractor Defs.' Opp'n to Pls.' MSJ, Ex. B at 26.)  Dunhill's representative testified that to his knowledge, Dunhill never directly paid Vision's employees.  (General Contractor Defs.' Opp'n to Pls.' MSJ, Ex. C at 37.)  He further testified that Dunhill ensured Vision paid its employees properly by requiring Vision to execute the subcontract stating Vision will abide by all laws.  (Id. at 33.)

However, some of the subcontracts require Vision to comport with certain payment practices, and give the General Contractor Defendants the right to take action if

Vision fails to do so.  For instance, the subcontract between Vision and Burke provided that Vision shall "[w]ithin seven (7) days of award of Subcontract, submit labor rate sheet[s] for each trade applicable to Subcontractor's scope of work, and such rates are to be approved by Burke Construction Group."  (Pls.' MSJ as to General Contractor Defs., Ex. A, Attach. A at Item 33.)  The Desert Winds subcontract provides that it may "directly contact [Vision's] employees . . . to ensure that such parties are being paid in a timely and complete manner by [Vision]," that a ten percent portion of Vision's invoices shall be withheld "to ensure that all liens and monies have been properly paid," and that "[Vision] agrees to promptly pay, when due, all claims for labor . . . to prevent the filing of any lien, attachment, garnishment, or suit involving [Desert Winds]."  (Pls.' MSJ as to General Contractor Defs., Ex. G at §§ 4, 6, 7.)  The Richmond American subcontract allows it to pay Vision's employees directly.  (Pls.' MSJ as to General Contractor Defs., Ex. CC at Art. 6.6.3.)  The Dunhill, Harmony, and KB Homes subcontracts provide that they may issue joint checks to Vision and its employees.  (Pls.' MSJ as to General Contractor Defs., Ex. Q at § 4.3, Ex. V at § 4.3, Ex. Z at § 4(d).)

Although these provisions give the General Contractor Defendants indirect control over whether Plaintiffs were paid, there is no evidence in the record that the General Contractor Defendants acted on these provisions.  For instance, KB Homes' representative testified that "if somebody reported . . . that they weren't being paid appropriately, then [he] would look further into it."  (Pls.' MSJ as to General Contractor Defs., Ex. BB at 31.)  But he stated he had not had to conduct such an investigation.  (Id.)

Focusing on the economic reality of the circumstances as a whole, there is no evidence that the General Contractor Defendants directly dictated Plaintiffs' rate or method of payment.  However, there are various provisions in the subcontracts that give the General Contractor Defendants some measure of indirect control over Plaintiffs' wages.  Although these provisions do not imply the same amount of involvement as a general

contractor who negotiates pay rates with subcontractors' employees and pays them directly, they still give the General Contractor Defendants some indirect control over Plaintiffs' rate and method of payment, even if the General Contractor Defendants do not exercise this control.  Thus, this factor weighs slightly in favor of finding a joint employment relationship.

### d.  Maintain Employment Records

Plaintiffs argue the General Contractor Defendants maintained employment records because some of the General Contractor Defendants kept forms such as labor release forms and daily sign in sheets.  The General Contractor Defendants respond that Plaintiffs' characterization of these documents as employment records is tenuous because they do not relate to Plaintiffs' payment or hours.  Specifically, the General Contractor Defendants argue the labor release forms are intended to confirm the labor costs Vision incurred on projects, and that the forms do not document any direct payment from the General Contractor Defendants to Plaintiffs.  Regarding Burke's daily sign in sheets, the General Contractor Defendants argue they were used to track who was present on the job site and to ensure that only authorized persons were permitted entry to ensure a secure job site, not to track Plaintiffs' hours.

Plaintiffs submit evidence of various records the General Contractor Defendants kept.  For example, some Plaintiffs signed Burke's "Labor Release" form stating that Plaintiffs had received all payments due for the labor provided, that the pay received was at the correct rate, and that they had "no unresolved payment issues."  (Pls.' MSJ as to General Contractor Defs., Ex. E.)  Plaintiffs submit similar "Labor Release" forms used by Desert Winds, Dunhill, and Harmony, however, none of the Plaintiffs' names are listed on the forms.  (Pls.' MSJ as to General Contractor Defs., Ex. I, Ex. U, Ex. X.)  According to Dunhill and Burke, the purpose of the Labor Release Forms is to document Vision's labor costs and whether Vision's employees were paid.  (General Contractor Defs.' Opp'n to

Pls.' MSJ, Ex. A at 55, Ex. C at 38.)  Burke also required Plaintiffs to sign in and out of the Perry Plaza project on a daily sign in sheet.  (Pls.' MSJ as to General Contractor Defs., Ex. B at 22, Ex. D.)  Vision submitted to Burke a "Daily Manpower & Activity Report" indicating how many hours its employees worked and what work was accomplished.  (Pls.' MSJ as to General Contractor Defs., Ex. F.)

However, in their declarations, the General Contractor Defendants aver they did not maintain any employment records for Plaintiffs.  (Defs.' MSJ, Ex. N at ¶ 8, Ex. O at ¶ 9, Ex. P at ¶ 9, Ex. Q at ¶ 9, Ex. R at ¶ 9, Ex. S at ¶ 9.)  Desert Winds, Dunhill, and KB Homes' representatives further testified they did not record the names of any individual Vision employees.  (General Contractor Defs.' Opp'n to Pls.' MSJ, Ex. B at 29, Ex. C at 37, Ex. D at 38.)

Although the General Contractor Defendants argue that the records at issue do not document direct payments from the General Contractor Defendants to Plaintiffs and were not used to track Plaintiffs' hours, and therefore do not constitute employment records, the Labor Release Forms pertain to whether Plaintiffs were paid, and the Daily Manpower & Activity Report lists the number of hours Plaintiffs worked.  See 29 U.S.C. § 211(c) (requiring an employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him").  Thus, this factor weighs slightly in favor of finding a joint employment relationship.

### 2.  Torres-Lopez Factors

#### a.  Specialty Job on the Production Line

Plaintiffs argue painting and drywall installation are akin to a specialty job in a production line because they each constitute one small step in the sequence of steps needed to construct a building.  Plaintiffs analogize painting and drywall installation to the deboning work in a slaughterhouse in Rutherford Food Corp. v. McComb, 331 U.S. 722,

725-26 (1947), in which the workers' tasks were determined to be part of a "series of independent steps."  The General Contractor Defendants argue that although painting and drywall installation are part of the process of constructing a building, hiring a specialty subcontractor such as Vision is not akin to an independent step in a production line.

Although the parties present argument of counsel regarding the nature of painting and drywall installation, they do not point to any evidence in the record indicating whether painting and drywall installation are skilled specialty jobs or whether they are a series of tasks unrelated to any other project in the construction process.  Moreover, there is no evidence regarding the relationship of painting and drywall installation work to the General Contractor Defendants' projects as a whole.  Thus, this factor is neutral.  See Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1028-31 (9th Cir. 2001) (stating that a court need not "comb the record" looking for a genuine issue of material fact if the party has not brought the evidence to the court's attention) (quotation omitted)).

> b.  Responsibilities Under Subcontracts Pass From One
> Subcontractor to Another Without Material Changes

Plaintiffs argue the General Contractor Defendants dictate unchanging terms to their subcontractors, as evidenced by the fact the subcontracts at issue are nearly identical. Plaintiffs further argue the subcontracts passed to Vision without material change, as evidenced by the fact that few provisions in the subcontracts between Vision and the General Contractor Defendants were "crossed out."  (Pls.' MSJ as to General Contractor Defs. at 9, 14, 17, 20, 24, 27.)  The General Contractor Defendants respond that Vision was an experienced subcontractor that negotiated the scope of its work with the General Contractor Defendants and that the responsibilities under the subcontracts were unique to Vision.  The General Contractor Defendants further argue that if Vision failed to perform or abandoned a job, the General Contractor Defendants would have been obligated to retain another subcontractor and would have been unable to transfer the Vision subcontract to a

new subcontractor without negotiating new terms.

The parties present argument of counsel regarding the subcontract negotiation process as a general matter, however, they do not point to any specific evidence in the record as to whether the subcontracts at issue passed to Vision without material changes. Although Plaintiffs point out that few of the provisions in the signed subcontracts were "crossed out," this does not necessarily mean there were few material changes. There is no evidence in the record as to how many drafts of the subcontracts were exchanged, what changes were made to the subcontracts during negotiations, or the length and extent of the subcontract negotiations. Thus, this factor is neutral. See Carmen, 237 F.3d at 1028-31.

c. Premises and Equipment

Plaintiffs argue that because the General Contractor Defendants owned some of the job sites and provided facilities such as power, portable toilets, and trash receptacles, the General Contractor Defendants provided the premises and equipment used for Plaintiffs' work. With respect to the premises, the General Contractor Defendants respond it would be impossible for a painting and drywall subcontractor to perform work at a location other than the premises where the construction is occurring. The General Contractor Defendants further respond that general contractors routinely provide utilities and sanitary facilities for entire job sites for economic efficiency purposes, because general contractors' direct employees also require these facilities, and because these facilities are necessary to maintain a safe and sanitary job site. The General Contractor Defendants further argue Plaintiffs do not provide evidence indicating the General Contractor Defendants provided the tools and materials used to perform Plaintiffs' work such as hammers, nails, saws, drills, drywall, paint, and tape.

KB Homes and Richmond American owned the job sites on which Vision's employees worked. (Pls.' MSJ as to General Contractor Defs., Ex. AA at § 1, Ex. CC at Art. 6.2.6.) At the Perry Plaza project, Burke provided temporary facilities such as

lighting, fencing to secure the project site, power generators, and portable toilets.  (Pls.'
MSJ as to General Contractor Defs., Ex. B at 24.)  Some of the other General Contractor
Defendants also provided portable toilets and trash bins.  (Pls.' MSJ as to General
Contractor Defs., Ex. H at 16, Ex. R at 30, Ex. Y at 18, Ex. CC at Art. 3.17, Ex. EE at 19.)

The General Contractor Defendants, however, aver they did not provide tools or
equipment for Plaintiffs' work.  (Defs.' MSJ, Ex. N at ¶ 9, Ex. O at ¶ 10, Ex. P at ¶ 10, Ex.
Q at ¶ 10, Ex. R at ¶ 10, Ex. S at ¶10.)  Almaraz and opt-in Plaintiffs Jose Garcia Cruz, Jose
Palacio, Joel Solis, Jaime Barraza, Porfirio Pamplona Santos, and Jaime Magallanes-Munoz
testified they either provided their own tools or used Celestino Monterrosas Silva, Santiago,
or Huachan-Guero's[4] tools.  (Defs.' MSJ, Ex. B at 148, Ex. D at 90, Ex. E at 86, Ex. I at 68,
Ex. J at 74-75, Ex. K at 67, Ex. L at 70.)  Regarding materials, Vision supervisor Heber
Chavez testified he delivers nails, screws, and tape to Vision's employees and that another
company delivers drywall sheets to employees at the project sites.  (Pls.' MSJ as to Vision,
Ex. P at 41.)

Plaintiffs uniformly testified that the tools they actually used to perform their
work belonged to Plaintiffs, Plaintiffs' supervisors, or to Vision.  Moreover, the record
indicates Plaintiffs' materials were provided by Vision.  Although the General Contractor
Defendants provided some facilities such as power, portable toilets, and trash receptacles,
these types of facilities would be used by any worker on a job site, not just Plaintiffs, and
they do not directly relate to painting and drywall installation.  Although two of the General
Contractor Defendants owned the job sites, this fact does not weigh strongly in favor of
joint employment because Plaintiffs presumably could not have performed their painting
and drywall installation work at a location other than the job sites.  Thus, this factor weighs

---

[4]  Though none of the parties point to evidence in the record explicitly stating whether
Huachan-Guero was employed by Vision or the General Contractor Defendants, it appears he was a
Vision employee.  (See Pls.' MSJ as to Vision, Ex. J at 53; Defs.' Opp'n to Pls.' MSJ, Ex. D at 93.)

against finding a joint employment relationship.

### d.  Employee Business Organization

Plaintiffs concede the fourth <u>Torres-Lopez</u> factor, which examines whether employees have a business organization that shifted as a unit from one job site to another, does not weigh in Plaintiffs' favor.  (Pls.' MSJ as to General Contractor Defs. at 9, 13, 16, 20, 24, 27.)  Plaintiffs were part of an organized business structure, i.e., Vision, that moved from one job site to another.  Plaintiffs allege they worked on various job sites owed by individual General Contractor Defendants.  Moreover, there is no evidence indicating Vision could not work on multiple projects for multiple general contractors.  Thus, this factor weighs against finding a joint employment relationship.

### e.  Skill Level

Plaintiffs argue painting and drywall installation do not require special skill, initiative, foresight, or special training.  They further argue they had no discretion regarding the manner in which their work was completed because it had to conform with the scope of work set forth in the subcontracts between Vision and the General Contractor Defendants.  The General Contractor Defendants respond it is standard industry practice for subcontracts to include a detailed scope of work so that general contractors and subcontractors are clear on their respective obligations and responsibilities, to maintain consistency throughout the project as a whole, and for quality control.  The General Contractor Defendants further argue a scope of work, no matter how detailed, is not meant to set forth specific instructions regarding how a subcontractor is to accomplish the work.

The parties do not point to evidence in the record regarding Plaintiffs' training or skill levels.  The only evidence in the record regarding the manner in which Plaintiffs accomplished their work is Plaintiffs' testimony that they received instructions and feedback regarding their work from Vision's supervisors.  Given that the only instructions and feedback Plaintiffs received were from Vision's supervisors, this factors weighs

slightly against a finding of joint employment liability.

### f. Opportunity for Profit and Loss from Managerial Skill

Plaintiffs argue that because they were paid a piece rate for completed projects, they had no opportunity for profit or loss depending on their managerial skills. The General Contractor Defendants argue that because they were not involved in setting Plaintiffs' compensation scheme, they did not know how Vision paid Plaintiffs. They further argue Plaintiffs' opportunity for profit or loss depended on Vision's managerial success.

Beyond the fact that Vision paid Plaintiffs a piece rate, thereby encouraging Plaintiffs to work steadily and minimizing the need for supervision, the parties do not point to any other evidence in the record indicating how or whether Plaintiffs' managerial skills impacted their income. Thus, this factor is neutral. See Carmen, 237 F.3d at 1028-31.

### g. Permanence in the Working Relationship

Plaintiffs concede the seventh Torres-Lopez factor, which examines whether there was permanence in the working relationship, weighs against a finding of joint employment. (Pls.' MSJ as to General Contractor Defs. at 9, 13, 16, 20, 24, 27.) There is no evidence in the record that Plaintiffs' working relationships with the General Contractor Defendants were permanent. Nor do the parties point to evidence in the record indicating there is an expectation or obligation that the General Contractor Defendants would use Vision on future projects. Thus, this factor weighs against finding a joint employment relationship.

### h. Service Rendered Was an Integral Part of Business

As for whether Plaintiffs' work was an integral part of the General Contractor Defendants' business, Plaintiffs argue painting and drywall installation is an integral part of construction. The General Contractor Defendants respond that although the work itself may be classified as integral to construction, Plaintiffs' contribution as laborers was not.

They further argue Vision could have replaced Plaintiffs with other laborers and the General Contractor Defendants would not have known.

Beyond argument of counsel, the parties do not point to any evidence in the record indicating whether painting and drywall installation is an integral part of construction, though the Court recognizes the practical necessity of drywall and paint in a building.  Moreover, the Ninth Circuit has expressed doubt as to whether this factor applies outside the context of assembly line type work.  Moreau, 356 F.3d at 952 ("We question whether or not this factor translates well outside of the production line employment situation; we also doubt that many of the functions, such as food service or cargo transport, are actually 'integral' to a passenger airline.")  Thus, this factor is neutral.  See Carmen, 237 F.3d at 1028-31.

### 3.  Balancing of Factors

Considering the totality of the circumstances and the economic reality of the relationship between Plaintiffs and the General Contractor Defendants, and viewing all facts and drawing all inferences in favor of Plaintiffs on the General Contractor Defendants' Motion, no genuine issue of material fact remains that the General Contractor Defendants are not Plaintiffs' joint employers.  The General Contractor Defendants did not have the power to hire and fire Plaintiffs.  Though the General Contractor Defendants exercised some measure of indirect control over Plaintiffs' work schedules and conditions of employment, Vision exerted day-to-day control over Plaintiffs' work schedules and conditions of employment, including giving Plaintiffs assignments and checking Plaintiffs' work.  Although the General Contractor Defendants exerted some measure of indirect control over Plaintiffs' rate and method of payment and kept some employment records for a few Plaintiffs, these factors do not outweigh the factors discussed above, which weigh heavily against finding a joint employer relationship.  Moreover, the Court may find no joint employment even if some factors weigh in favor of finding joint employment.

Finally, the <u>Torres-Lopez</u> factors are either neutral or favor finding no joint employment. The Court therefore will grant the General Contractor Defendants' Motion on this issue and will deny Plaintiffs' Motion on this issue.

### B.   Opt-In Consent Forms

The General Contractor Defendants move to dismiss from this case opt-in Plaintiffs Jaime Magallanes-Munoz ("Magallanes-Munoz") and Francisco Cervantes ("Cervantes") for failure to properly file consent forms.  The General Contractor Defendants acknowledge that two of the consent forms filed in this case were dated, but not signed, but they argue it is impossible to determine whether Magallanes-Munoz and Cervantes are the individuals associated with the forms.  The General Contractor Defendants therefore argue Magallanes-Munoz and Cervantes are not properly included in the opt-in class.

Plaintiffs respond that Magallanes-Munoz and Cervantes are properly included. They acknowledge Magallanes-Munoz and Cervantes failed to sign on the signature line of the consent forms, but argue they wrote their names on the bottom portion of the forms, which portions were redacted by counsel to conceal Magallanes-Munoz and Cervantes' addresses and telephone numbers.  Plaintiffs attach newly redacted copies of the consent forms to their response, which have Magallanes-Munoz and Cervantes' names printed in the bottom section labeled "For Attorney Use Only."  (Resp. to Defs.' MSJ, Ex. K.)  The General Contractor Defendants reply that Plaintiffs fail to authenticate the handwriting on the newly redacted consent forms and that because Plaintiffs did not provide admissible evidence that Magallanes-Munoz and Cervantes provided their consent, they should be dismissed from the lawsuit.

Pursuant to the FLSA, a plaintiff may pursue a collective action for unpaid wages and unpaid overtime compensation "for and in behalf of himself . . . and other employees similarly situated." 29 U.S.C. § 216(b).  Section 216(b) further provides an

employee is not a party plaintiff to any such action unless he gives his consent in writing, and the consent is filed in the court in which the action is brought.  Id.

Here, the newly redacted consent forms do not include Magallanes-Munoz and Cervantes' signatures, and there is no way for the Court to know whether the handwriting which appears in the "For Attorney Use Only" section of the forms is that of Magallanes-Munoz and Cervantes or of someone else.  Thus, the Court cannot determine whether Magallanes-Munoz and Cervantes provided their consent pursuant to § 216(b).  The Court therefore will provide Magallanes-Munoz and Cervantes with thirty (30) days from the date of this Order to submit individual affidavits clarifying whether they intended the printed names in the "For Attorney Use Only" sections to constitute their consent in writing to sue pursuant to § 216(b) and authenticating their handwriting on the consent forms that previously were submitted to the Court.  Failure to comply with this Order will result in the dismissal of Magallanes-Munoz and Cervantes' claims.

**III.  CONCLUSION**

IT IS ORDERED that Defendants Las Vegas Land Contracting LLC d/b/a Dunhill Homes; Burke Construction Group, Inc.; Richmond American Homes of Nevada, Inc.; Harmony Homes, Inc.; Desert Wind Homes of Nevada II, Inc. d/b/a Russell Rogers Development; KB Home Las Vegas, Inc. and KB Home Nevada, Inc.'s Motion for Summary Judgment (Doc. #76) is hereby GRANTED in part and DENIED in part.  The Motion is granted to the extent that Defendants have established no genuine issue of material fact remains that Defendants Las Vegas Land Contracting LLC d/b/a Dunhill Homes; Burke Construction Group, Inc.; Richmond American Homes of Nevada, Inc.; Harmony Homes, Inc.; Desert Wind Homes of Nevada II, Inc. d/b/a Russell Rogers Development; KB Home Las Vegas, Inc. and KB Home Nevada, Inc. are not Plaintiffs' joint employers.  The Motion is denied in all other respects.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment as

to General Contractor Defendants (Doc. #77) is hereby DENIED.

IT IS FURTHER ORDERED that Judgment is hereby entered in favor of Defendants Las Vegas Land Contracting LLC d/b/a Dunhill Homes; Burke Construction Group, Inc.; Richmond American Homes of Nevada, Inc.; Harmony Homes, Inc.; Desert Wind Homes of Nevada II, Inc. d/b/a Russell Rogers Development; KB Home Las Vegas, Inc. and KB Home Nevada, Inc. and against Plaintiffs.

IT IS FURTHER ORDERED that Plaintiffs Jaime Magallanes-Munoz and Francisco Cervantes shall have thirty (30) days from the date of this Order to submit affidavits clarifying whether they intended the printed names in the "For Attorney Use Only" sections of the Opt-In Consent Form to constitute their consent in writing to sue pursuant to 29 U.S.C. § 216(b) and authenticating their handwriting on the consent forms. Failure to comply with this Order will result in the dismissal of Jaime Magallanes-Munoz and Francisco Cervantes' claims.

IT IS FURTHER ORDERED that Defendants' Motion to Decertify as a Representative Collection Action (Doc. #70) is set for hearing on Thursday, June 26, 2014, at 11:00 a.m. in Courtroom 7C, in the United States District Court, District of Nevada, located at 333 S. Las Vegas Blvd., Las Vegas, Nevada, 89101.

IT IS FURTHER ORDERED that the parties shall meet and confer and shall file a joint pretrial order no later than Thursday, July 24, 2014.

IT IS FURTHER ORDERED that this matter is referred to United States Magistrate Judge Peggy A. Leen for a settlement conference.


DATED: May 15, 2014


PHILIP M. PRO
United States District Judge